GRAND ISLE COURTS

STATE OF VERMONT
GRAND ISLE COUNTY, SS.   FILED APR 1 2 2005

| | | |
|---|---|---|
| Dr. Anne K. G. Bazilwich, | ) | District / Superior / Probate |
| Plaintiff, | ) | |
| | ) | Grand Isle Superior Court |
| v. | ) | |
| | ) | Docket No. |
| Countrywide Home Loans, Inc., and | ) | |
| Countrywide Financial Corporation, | ) | $1:05-CV-120$ |
| Defendants. | ) | |

## COMPLAINT

**NOW COMES** the plaintiff, Dr. Anne K. G. Bazilwich (hereinafter "Plaintiff"), in the above-entitled matter, by and through her attorney, John J. Balkunas, Jr., Esq., and hereby complains of the defendants, Countrywide Home Loans, Inc. (hereinafter "Defendant1") and Countrywide Financial Corporation (hereinafter "Defendant2"), hereinafter Defendant1 and Defendant2 collectively referred to as "Defendants", as follows:

### COUNT ONE

1.      Plaintiff was at all times relevant herein, and is presently, a resident of Grand Isle, County of Grand Isle and State of Vermont, and the sole owner in fee simple of her home and residence located at 3 Old Town Lane in the Town of Grand Isle, County of Grand Isle, and State of Vermont.

2.      Upon information and belief, Defendant1 is a corporation incorporated under the laws of the State of New York and with its principal place of business in the City of Calabasa, County of Los Angeles, and State of California.

3.      Upon information and belief, Defendant2 is a corporation incorporated under the laws of the State of New York and with its principal place of business in the City of Calabasa, County of Los Angeles, and State of California.

4.      Upon information and belief, at all times relevant herein, Defendant1 is the main subsidiary of the Defendant2.

5.      Upon information and belief, at all times relevant herein, Defendants offered, owned, managed, and otherwise engaged, in mortgage banking business in Vermont and Texas, as well as a number of other states in the United States.

6.      In June of 2003, the Plaintiff lost the opportunity to refinance her home when

mortgage rates were at their lowest in over thirty (30) years because she relied on Defendants employee Sarah Martin's promises and misrepresentations that Countrywide Home Loans, Inc. would beat the cash out refinance quote that Plaintiff was concurrently offered by Homebound Mortgage, Inc. (hereinafter "Homebound").

7.     In June of 2003, Homebound's offer to Plaintiff was to provide a 30-year fixed, 5.00 % interest, with no points and no documentation, $312,000.00 refinancing of her existing mortgage with a $59,311.30 cash-out (estimated cash out based upon an estimated $250,000.00 payoff for existing mortgage).

8.     On June 9, 2003, Plaintiff  was only a phone call and/or signature away from accepting and locking in Homebound's offered rate.

9.     On June 9, 2003, Sarah Martin was an employee of the Defendants and worked at its Kingwood, Texas Division location.

10.    On June 9, 2003, Sarah Martin was working with Plaintiff's father, Louis M. Georgiades in connection with the Defendant1 refinancing of Plaintiff's parents home in Kingwood, Texas.  The closing of which ultimately took place in August of 2003.

11.    On June 9, 2003, during a conference call initiated by Sarah Martin, where Ms. Martin, Mr. Georgiades, and Plaintiff were all present, Plaintiff advised Ms. Martin of Homebound's aforementioned offer and Plaintiff's ability to immediately lock the Homebound rate in.  Ms. Martin, in response, advised Plaintiff that she could do better than Homebound's offer, and that Defendants could provide a 30-year fixed, 4.75 % interest with no points and no documentation, $312,000.00 refinance with a larger cash-out.  During said conference call Ms. Martin requested a copy of Homebound's "Good Faith Estimate" as proof of Homebound's offered terms.

12.    On June 12, 2003, Plaintiff provided Ms. Martin with the requested Homebound "Good Faith Estimate" and once again advised Ms. Martin that she could lock the Homebound rate immediately.  Ms. Martin on the same date, during a second conference call between Ms. Martin, Mr. Georgiades, and Plaintiff, told Plaintiff not to commit or lock into the Homebound loan because she would get the 4.75%, no points, no document, Countrywide rate, with a larger cash-out.  Ms. Martin during this June 12, 2003, conference call advised Plaintiff that she would get back to Plaintiff ASAP with the Countrywide loan paperwork.  A copy of Homebound's

Good Faith Estimate dated June 12, 2003 is attached hereto as **Exhibit "A"**.

13.     Ms. Martin thereafter allowed two (2) weeks to pass before advising Plaintiff or Mr. Georgiades that she could not follow through on her prior promises. During said aforementioned two (2) week period many calls were placed by plaintiff and Mr. Georgiades; but Ms. Martin was consistently unavailable. During said two (2) week period Plaintiff and Mr. Georgiades were initially advised by certain Defendant1 employees in the Kingwood location that Ms. Martin was out of the office to care for her sick children, and subsequently that she was on vacation.

14.     By the time Ms. Martin finally advised either the Plaintiff or Mr. Georgiades after the aforementioned two (2) week period that she could not follow through on her false and misleading promises, statements, and disclosures, Plaintiff was no longer able to lock in with Homebound at anything close to the aforementioned Homebound rate since mortgage rates had risen by then to over a percentage point higher.

15.     At all times relevant herein, Ms. Martin's representations, omissions, and/or practices, with respect to Defendants ability to beat Homebound's offer rate, were false and likely to mislead Plaintiff.

16.     At all times relevant herein, Ms. Martin's messages were reasonably interpreted by the Plaintiff under the circumstances.

17.     At all times relevant herein, the misleading effects of Ms. Martin's statements were material, in that they affected Plaintiff's decision whether to lock in Homebound's offered rate.

18.     As a result of Ms. Martin's aforementioned harmful misconduct, Plaintiff was damaged in the approximate amount of $59,311.30 (the estimated cash out) plus interest thereon since: (i) the monthly payment Homebound was offering (in early-June 2003) was roughly the same as the Plaintiff's existing mortgage; and (ii) the loan would only extend the payments for one year beyond the Plaintiff's existing mortgage. Plaintiff also suffered other damages, both foreseeable and not, as a result her not obtaining the aforementioned cash-out, including but not limited to lost interest thereon, lost opportunities (both personal and business related), etc.

19.     At all times relevant herein, Ms. Martin's aforementioned conduct: (i) amounted to Fraud (both consumer and common law); and (ii) manifested malice, ill will, or wanton

conduct entitling Plaintiff to exemplary damages in addition to compensatory damages under Vermont's Consumer Fraud Act, 9 V.S.A. §§ 2451-2480g (hereinafter "Consumer Fraud Act").

## COUNT TWO

20.     Plaintiff hereby repeats and re-alleges Paragraphs 1 thorough 19 as if set forth more fully herein.

21.     In February of 2004, mortgage interest rates dropped to within one percentage (1%) point of the June of 2003 rates.

22.     On February 13, 2004, Plaintiff faxed to Angelo R. Mozilo, Chairman, President, and CEO, of Countrywide Financial Corporation correspondence setting forth the events of June of 2003, and the Plaintiff's subsequent inability to have Defendants: (i) stand by the promises of their employee, Ms. Martin; nor (ii) make Plaintiff whole as a result of Ms. Martin's misconduct. A copy of the correspondence to Mr. Mozilo dated March 25, 2004 is attached hereto as **Exhibit "B"**.

23.     Plaintiff was thereafter advised by Jessica Jimenez of the Office of the President, that Marti Luciano, Customer Relations Specialists, had been assigned the Plaintiff's complaint that was received by their office.

24.     Thereafter, between February 25, 2004, and March 25, 2004, Plaintiff attempted to work with various employees of Defendants, both Texas and Vermont, in connection with making her whole and fixing Ms. Martin's aforementioned mistakes in June of 2003.

25.     After a series of so-called "passing the buck"... and a number of phone calls and information exchanges, Defendants finally advised Plaintiff that they would not accommodate Plaintiff's demand/request and her whole since no employee of the Defendants would waive or pay the fees necessary to purchase the points required in order to create a Defendant1 mortgage with rate and terms equivalent to the Homebound rate and terms offered back in June of 2003.

26.     At an apparent impass, the undersigned wrote a letter dated March 25, 2004 (sent by facsimile and regular mail), to Sandor E. Samuels, Esq., Chief Legal Officer of Countrywide Financial Corporation, setting forth the situation, context, closeness of the parties, and how easy it would have been at that point in time to make the Plaintiff whole with a minimal financial impact to Defendants if someone in Defendants' organization would simply take the appropriate actions. A copy of the undersigned's correspondence to Attorney Samuels dated March 25, 2004

is attached hereto as **Exhibit "C"**.

27.     The undersigned never received the courtesy of phone call or letter from Attorney Samuels; but the undersigned and Plaintiff did received a letter approximately three (3) weeks later dated April 13, 2004 from Marti Luciano, the Customer Relations Specialists originally assigned to Plaintiff's demand/complaint.  A copy of the letter received from Ms. Luciano dated April 13, 2004 is attached hereto as **Exhibit "D"**.

28.     Notwithstanding the foregoing, and allegation 25 herein, Defendant, as an underwriter of its own mortgages, could simply have offered Plaintiff an equivelent mortgage without needing to address points; but chose not to do so by letting this matter be handled my low level and/or incompetant employees with no authority or inclination to fix Ms. Martin's mistake and stand by the Defendants stated policy of customer satisfaction... and brochure language and claims that Plaintiff should "expect exceptional service."  A copy of Defendants' Corporate Responsibility and Code of Business Ethics statements being published at that time, and that were viewed and rellied upon by the Plaintiff, are attached hereto as **Exhibit "E"**.

29.     As a result of the aforementioned needless, careless, and reckless, delays that were not in anyway related to Plaintiff's conduct, in part due to inadequate and/or incompetant staffing (also an issue in June 2003), another opportunity to make Plaintiff whole was lost when interest rates once again rose to levels making it pointless for Plaintiff to lock in with Defendant1 at their best offered rate February-March of 2004, or attempt refinancing with other lenders, once Defendants made it clear that Defendants would not stand behind their employee's promises, or their purported "customer satisfaction" misrepresentations.  *See* **Exhibit "E"**.

30.     As a result of the aforementioned conduct, including but not limited to the negligent mistrusting of the aforementioned important time sensitive matter to inappropriate and/or incompetant employees, a second harm to Plaintiff resulted since Plaintiff had been initially (and for at approximately two (2) months thereafter) mislead to believe that Defendants would fix the problem Ms. Martin created in the name of: (i) customer satisfaction; (ii) correcting a mistake of one of its employees; and (iii) standing behind its brochure language and claim that Plaintiff should "expect exceptional service."  *See* **Exhibit "E"**.

31.     At all times relevant herein, Defendants representations, omissions, and/or practices, with respect to purportedly being amendable to making Plaintiff whole... and at least

C:\_JohnLegal\Client\Bazilwich vs Countrywide\Bazilwich.Countrywide.04-05-05 Summonces and Complaint and Request for Waiver from Principal.wpd

Page 5 of 8

matching Homebound's June 2003 offer... were false and likely to mislead Plaintiff.

32.    At all times relevant herein, Defendants messages were reasonably interpreted by the Plaintiff under the circumstances.

33.    At all times relevant herein, the misleading effects of Defendants statements were material, in that they affected Plaintiff's decision whether to lock into Defendant1's best February-March 2004 offered rate, or attempt refinancing with other lenders.

34.    As a result of Ms. Martin's aforementioned harmful misconduct, Plaintiff was damaged in the approximate amount of $59,311.30 (the estimated cash out) plus interest thereon since: (i) the monthly payment Homebound was offering (in early-June 2003) was roughly the same as the Plaintiff's existing mortgage; and (ii) the loan would only extend the payments for one year beyond the Plaintiff's existing mortgage.  Plaintiff also suffered other damages, both foreseeable and not, as a result her not obtaining the aforementioned cash-out, including but not limited to lost interest thereon, lost opportunities (both personal and business related), etc.

35.    At all times relevant herein, Defendants aforementioned conduct: (i) amounted to Fraud (both consumer and common law); and (ii) manifested malice, ill will, or wanton conduct entitling Plaintiff to exemplary damages in addition to compensatory damages under the Consumer Fraud Act.

### COUNT THREE

36.    Plaintiff hereby repeats and re-alleges Paragraphs 1 thorough 19 as if set forth more fully herein.

37.    At all times relevant herein, Ms. Martin had superior knowledge and/or means of knowledge.

38.    At all times relevant herein, Ms. Martin's false statements of material facts were offered for the purpose of inducing Plaintiff to act or refrain from acting in reliance thereon.

39.    At all times relevant herein, Ms. Martin's false misrepresentations, omissions, or fraudulent concealment, were calculated to discourage independant investigation by Plaintiff and lead Plaintiff to forebear from making further inquiries.

40.    At all times relevant herein, Plaintiff justifiably relied upon the false information provided by Ms. Martin which caused Plaintiff's pecuniary loss.

41.    At all times relevant herein, Ms. Martin had full information, and her inadequate

C:\John\Legal\Clients\Buzzbrick vs Countrywide\Buzzbrick.Countrywide.04-05-05 Summonses and Complaint and Request for Waiver from Principal.wpd

Page 6 of 8

and untimely disclosures constituted a failure to exercise reasonable care or competence in obtaining and/or communicating the information, resulting in harm to Plaintiff as a result of said Detrimental Reliance and Negligent Misrepresentations.

## COUNT FOUR

42.    Plaintiff hereby repeats and re-alleges Paragraphs 1 thorough 19 as if set forth more fully herein.

43.    At all times relevant herein, the neither party communicated an intent not to be bound until the aforementioned oral agreement was reduced to a fully executed document.

44.    At all times relevant herein, there was nothing further to negotiate with respect to the agreement since all material terms had been agreed to between the parties, the agreement was not complex, and there had been a meeting of the minds.

45.    The Plaintiff partially performed the term of the agreement (Contract) between the parties requiring her to not lock-in Homebound's offer rate and terms, and Defendants thereafter breached the agreement (Contract).

46.    At all times relevant herein, said conduct by the Plaintiff removed the oral agreement (Contract) from the Statute of Frauds due to the Plaintiff's reasonable reliance upon the agreement (Contract), as well as her substantial and irretrievable change in position.

47.    While under the facts stated herein... the Plaintiff would be entitled to seek and obtain Specific Performance as a remedy if she was seeking strict enforcement of a purchase and sale agreement for real property, since the harm was the loss of the "cash out," enforcement of the agreement (Contract) and promise by the award of money damages is an adequate remedy, more appropriate, and warranted in this instance for the Defendants' Breach of Contract.

## COUNT FIVE

48.    Plaintiff hereby repeats and re-alleges Paragraphs 1 thorough 19 as if set forth more fully herein.

49.    At all times relevant herein, Ms. Martin's statements to Plaintiff, and Defendants subsequent conduct, both as set forth herein, amounted to: (i) a promise on which the promisor (Ms. Martin) reasonably expected the promisee (Plaintiff) to take action or forbearance of a substantial character; (ii) a promise inducing a definite and substantial action or forbearance by Plaintiff; and (iii) ultimately a situation where injustice can be avoided only through the

enforcement of the promise.

50.     Therefore, as a result, it is appropriate for the Court to award Plaintiff damages on her claim of Promissory Estoppel.

**WHEREFORE**, Plaintiff request the Court enter judgment under COUNT ONE through COUNT FIVE against the Defendants and as follows:

1.     Judgment in favor of Plaintiff and against Defendants jointly and severally for Plaintiff's pecuniary loss in the amount of $59,311.30 (the estimated cash out) plus interest thereon through the date of judgment.

2.     That the Court also enter an award of exemplary damages of three times the Plaintiff's pecuniary loss in the amount of $177,933.30 pursuant to the Consumer Fraud Act.

3.     That the Court also enter an award of reasonable attorney's fees and costs incurred in these proceedings pursuant to the Consumer Fraud Act.

4.     Such other relief as the Court deems appropriate.

Dated at South Burlington, Vermont, this 5th day of April, 2005.

JOHN J. BALKUNAS, JR., ESQ.
Attorney for Plaintiff

By: _____
John J. Balkunas, Jr., Esq.
3 Old Town Lane
Grand Isle, Vermont  05458
(802) 372-6145

**NOTICE TO DEFENDANT/DEBTOR UNDER FEDERAL FAIR DEBT
COLLECTION PRACTICES ACT 15 U.S.C. § 1692G:**

**The Law Firm Of John J. Balkunas, Jr., Esq. Is Attempting To Collect A Debt Owed To The Above Named Plaintiff/Creditor And It Will Use Any Information It Obtains About You In Order To Collect The Amounts Owed.**

I.     **The Amount Of The Debts Are Fully Outlined Hereinabove;**

II.     **The Debts Are Owed To This Plaintiff/Creditor, Dr. Anne K. G. Bazilwich;**

III.     **Unless You, Within Thirty Days After Receipt Of This Notice, Dispute The Validity Of The Debts, Or Any Portion Thereof, The Debts Will Be Assumed To Be Valid;**

IV.     **If You Notify The Above Law Firm Within Thirty Days That The Debts, Or Any Portion Thereof, Is Disputed, The Firm Will Obtain Verification Of The Debts And Mail You A Copy.  Do Not Confuse This Verification Request To Be Satisfied Within 30 Days With An Answer Required To Be Submitted Within 20 Days In The Event A Lawsuit Has Been Commenced;**

V.     **Upon Your Written Request Within The Thirty-Day Period, This Law Firm Will Provide You With The Address Of The Creditor If You Do Not Already Know It.**

VI.     **This Communication Is From A Debt Collector.**

## GOOD FAITH ESTIMATE

| | | | | |
|---|---|---|---|---|
| Applicants: | ANNE BAZILWICH | | Application No: | 30504741 |
| Property Addr: | VT | | Date Prepared: | 06/12/2003 |
| Prepared By: | Homebound Mortgage, Inc.  Ph. 1-800-914-2694 | | Loan Program: | 30 Year Fixed Conform |
| | 150 Water Tower Circle, Colchester, VT  05446 | | | |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-actual charges may be more or less. Your transaction may not involve a fee for every item listed.   The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Loan Amount $      312,000    Interest Rate:     5.000  %    Term:    360 / 360  mths

| 800 | ITEMS PAYABLE IN CONNECTION WITH LOAN: | | | | |
|---|---|---|---|---|---|
| 801 | Loan Origination Fee | | | $ | PFC |
| 802 | Loan Discount | 0.000% + $ | 0.00 | | PFC |
| 803 | Appraisal Fee | | (PAID) | 325.00 | PFC |
| 804 | Credit Report | | | WAIVED | |
| 805 | Lender's Inspection Fee | | | | |
| 808 | Mortgage Broker Fee | 0.000% + $ | 0.00 | | PFC |
| 809 | Tax  Related  Service  Fee | | | 75.00 | PFC |
| 810 | Processing Fee | | | | PFC |
| 811 | Underwriting Fee | | | 250.00 | PFC |
| 812 | Wire Transfer Fee | | | | PFC |
| | loan co-ordination | | | 525.00 | PFC |
| | LENDER ADMIN FEE | | | 140.00 | PFC |
| | | | | | |
| | ** REDUCED FEE SCENARIO AVAILABLE** | | | | |

| 1100 | TITLE CHARGES: | | | | |
|---|---|---|---|---|---|
| 1101 | Closing  or  Escrow  Fee: | Waiver Fees .25% | | $ | TBD | PFC |
| 1105 | Document Preparation Fee | | | | |
| 1106 | Notary Fees | | | | |
| 1107 | Attorney Fees | | | TBD | PFC |
| 1108 | Title Insurance: | APPROX $2/1000 | | 580.00 | |
| | closing agent/CONFIRM W/TITLE CO | | | 500.00 | PFC |

| 1200 | GOVERNMENT RECORDING & TRANSFER CHARGES: | | | |
|---|---|---|---|---|
| 1201 | Recording Fees: | | $ | 70.00 |
| 1202 | City/County Tax/Stamps: | | | |
| 1203 | State Tax/Stamps: | PURCHASE ONLY | | |
| | .5% ON 1ST 100K, 1.25%/K | | | |
| | AFTER | | | |
| | *2NDINVEST 1.25% ON ALL | | | |

| 1300 | ADDITIONAL SETTLEMENT CHARGES: | | | |
|---|---|---|---|---|
| 1302 | Pest Inspection | | $ | |
| | Flood Certification Fees | | | 10.00 | PFC |
| | | | | |
| | YSP.POC FROM LENDER 0-4% | | | |

| | | | Estimated Closing Costs | 2,475.00 | |
|---|---|---|---|---|---|
| 900 | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | | | |
| 901 | Interest for | 5 days @ $ | 42.7397 | per day | $ | 213.70 | PFC |
| 902 | Mortgage Insurance Premium | | | | PFC |
| 903 | Hazard Insurance Premium | | | | |
| 904 | PURCHASE- POLICY TO BE PREPAID I YEAR | | | | |
| 905 | VA Funding Fee | | | | PFC |

| 1000 | RESERVES DEPOSITED WITH LENDER: | | | | |
|---|---|---|---|---|---|
| 1001 | Hazard Insurance Premiums | 2 months @ $ | TBD | per month | $ | |
| 1002 | Mortgage Ins. Premium Reserves | months @ $ | | per month | | PFC |
| 1003 | School Tax | months @ $ | | per month | | |
| 1004 | Taxes and Assessment Reserves | 4 months @ $ | TBD | per month | | |
| 1005 | Flood Insurance Reserves | months @ $ | | per month | | |
| | | months @ $ | | per month | | |
| | | months @ $ | | per month | | |

| | | Estimated Prepaid Items/Reserves | 213.70 |
|---|---|---|---|
| TOTAL  ESTIMATED  SETTLEMENT  CHARGES | | | 2,688.70 |

| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE: | | TOTAL ESTIMATED MONTHLY PAYMENT: | |
|---|---|---|---|
| Purchase Price/Payoff (+) | 250,000.00 | Principal & Interest | 1,674.88 |
| Loan Amount (-) | 312,000.00 | Other Financing (P & I) | |
| Est. Closing Costs (+) | 2,475.00 | Hazard Insurance | TBD |
| Est. Prepaid Items/Reserves (+) | 213.70 | Real Estate Taxes | TBD |
| Amount Paid by Seller (-) | | Mortgage Insurance | |
| | | Homeowner Assn. Dues | |
| | | Other | |
| | | | |
| Total Est. Funds to you | 59,311.30 | Total Monthly Payment | 1,674.88 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.     The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the Consumer Handbook on ARM Mortgages.

| | | | | |
|---|---|---|---|---|
| Applicant  ANNE BAZILWICH | | Date | Applicant | Date |

Exhibit "A"

*3 Old Town Lane*
*Grand Isle, Vermont 05458*
*802-372-6145*
*DoctorB@sover.net*
*February 13, 2004*

**Via Facsimile 818-225-4431, 818-225-4051, and Regular Mail**

Angelo R. Mozilo, Chairman, President, and CEO
Countrywide Financial Corporation
4500 Park Granada
Calabasas, California 91302-1613

Re:   Dishonoring of representations and promises made by one of your
employees, Ms. Sarah Martin, at the Kingwood, Texas Division of
Countrywide Home Loans, Inc.

Dear Mr. Mozilo:

I have spent countless hours trying to resolve a rather serious situation through
your Countrywide Home Loans, Inc. subsidiary located in Kingwood, Texas.
However, all of my earnest attempts have failed to reconcile the above-referenced
matter.  The purpose of this direct letter to you is to give your company one final
chance to rectify this situation before it becomes a Vermont lawsuit.  I stated the
relevant facts below.

I lost my opportunity to refinance my home in June 2003, when the mortgage rates
were at their lowest in over thirty years, solely because I relied on your employee's
(Sarah Martin) promise that Countrywide Home Loans, Inc. (hereafter
Countrywide) would beat the cash out refinance quote that Homebound Mortgage,
Inc. (hereafter Homebound) concurrently offered me.

I submitted my application to Countrywide directly to Ms. Martin on June 9, 2003,
while on a conference telephone call initiated by Ms. Martin to my father and
acting agent, Mr. Louis Georgiades and me.  At this time, I mentioned that
Homebound offered me a Thirty-Year Fixed 5.00% Interest Rate with No Points
$312,000.00 Refinance with Cash Out Loan.  Ms. Martin told me, in the presence
of my father, that she would do better than the Homebound offer and provide a
Thirty-Year Fixed 4.750% Interest Rate with No Points and No Documentation

Exhibit "B"

$312,000.00 Refinance with Cash Out Loan. Ms. Martin requested the Homebound Good Faith Estimate as proof that they indeed offered me the loan at said terms and stated that once she had the Homebound documentation she would lock the Countrywide 4.750% No Points rate.

I provided Ms. Martin with the Homebound Good Faith Estimate and application documents on June 12, 2003 and made her aware that I could lock the Homebound rate immediately. Ms. Martin told me again, in the presence of my father, not to commit or lock into the Homebound loan because she would get the 4.750% No Points Countrywide rate with a larger cash out. She indicated that she would get back to me ASAP with the Countrywide loan paperwork.

However, she allowed two (2) weeks to pass before letting me know that she could not follow through on her promises. My father and I called her repeatedly during these two weeks, but Ms. Martin was consistently unavailable. Other Countrywide employees told us that Ms. Martin was out of the office initially to care for her sick children and subsequently for vacation. Obviously, Ms. Martin should have delegated her active caseload to fellow loan officers or her superior. By the time she got back to me, the market had changed considerably and I was unable lock into the Homebound rate stated above. In fact, I could not even lock into anything remotely close to the figures stated above; the rates were over a percentage point higher than when Ms. Martin assured me she could obtain the 4.75% No Points and No Documentation Refinance Loan.

Subsequently, I have obtained the services of John J. Balkunas, Jr., Esq., an attorney with:

Ward, Kenney, & Babb
3069 Williston Road
South Burlington, Vermont 05403
802-863-0307 extension 18

Mr. Balkunas is familiar with the facts of this case and he has advised me not to sue Countrywide seeking *Specific Performance*. Yet, he can provide an excellent case against Countywide for *Detrimental Reliance*.

Countrywide could have easily rectified this situation, especially since it does its own underwriting. Countrywide could have been implemented Ms. Martin's guarantee by buying down the points necessary to complete my 4.75% No Points and No Documentation Loan, at no additional cost to me. As time has progressed

during Countrywide's refusal to stand by their employee's misrepresentations, the cost to buy down the points necessary to reach a 4.75% No Documentation Loan has increased dramatically. Fortunately, interest rates have recently dropped; therefore, Countrywide should have no problem complying with this demand letter. Your brochure states that I should "Expect Exceptional Service," therefore I expect nothing less than my loan.

**I hereby demand that Countrywide uphold Ms. Martin's promise to beat Homebound's June 2003 offer and guarantee my Thirty-Year Fixed 4.75% Interest Rate with No Points and No Documentation $312,000.00 Refinance with Cash Out Loan.** Should you choose not to comply with this demand, I can ensure you that I will sue Countrywide in Vermont primarily under a tort theory based upon our reasonable detrimental reliance by your employee's material misrepresentations. If Countrywide is unwilling to stand behind its purported Code of Business Ethics, I will seek compensatory and consequential damages due to higher costs and the lost use of the funds in addition to punitive damages under the Vermont Consumer Friendly Fraud Statute,

I sincerely hope that you will take the time to look into this matter and give it the serious consideration it deserves. This should never have involved you nor should it wind up in court; obviously, Countrywide Home Loans, Inc.'s Texas Division should have resolved this situation months ago when Ms. Martin's mistake was first brought to their attention. However, you now have the opportunity to provide that "exceptional service."

Sincerely,

Dr. Anne K. G. Bazilwich

cc:    Stanford L. Kurland, President and Chief Executive Officer of Countrywide Home Loans, Inc.
       Sandor E. Samuels, Esq., Senior Managing Director and Chief Legal Officer of Countywide Financial Corporation

### John J. Balkunas, Jr., Esq. &
### Dr. Anne K. G. Bazilwich
### 3 Old Town Lane
### Grand Isle, Vermont 05458
### (802) 372-6145

March 25, 2004

**Via Facsimile @ (818) 225-4051 & Regular Mail**
Sandor E. Samuels, Esq., Chief Legal Officer
Countrywide Financial Corporation
4500 Park Granada
Calabasa, California 91302-1613

Re:   Dr. Anne K. G. Bazilwich vs. Countrywide Financial
Corporation

Dear Mr. Samuels:

This letter is a follow up to Dr. Anne K. G. Bazilwich's February 13, 2004 correspondence to Angelo R. Mozilo, Chairman, President, and CEO of Countrywide Financial Corporation in connection with the mishandling of a problem caused by one of Countrywide's Kingwood, Texas Division employees back in July of 2003. For your convenience, I have enclosed a copy of the February 13, 2004 letter.

While Dr. Bazilwich received promising responses to her letter, she is now having problems with Marty Luciano, a Consumer Division Representative assigned to handle the matter. I believe Ms. Luciano would benefit from your explaining to her the predicament that Countrywide will find itself in if it refuses to pay the minuscule .5 point cost required for Dr. Bazilwich to be put in the position that she would currently be in had Sarah Martin not told her that Countrywide would beat the 30 year fixed, 5.00 %, no point, cash-out refinancing "in-hand" package offered by Homebound Mortgage, Inc. that Dr. Bazilwich was only a signature away from accepting.

I am an attorney who primarily practices in this state, and my primary focus involves representing banks with their consumer transactions in a number of areas. I am well acquainted with the Vermont Consumer Fraud Act, 9 V.S.A. Chapter 63, which provides remedies for consumers who contract for goods or services in reliance upon false or fraudulent representations or unfair or deceptive practices. 9 V.S.A. § 2461(b). The act is consumer friendly, and provides for treble damages, attorney fees, and costs.

Exhibit "C"

Under 9 V.S.A. § 2353(a), a plaintiff must show that a defendant acted in a fraudulent or deceptive manner. To prove a deceptive act or practice, plaintiff must show:

- There was a representation, omission, or practice likely to mislead;
- The message was reasonably interpreted under the circumstances; and
- The misleading effects were material, in that they affected a persons conduct or decision regarding the purchase.

See *Carter v. Gugliuzzi*, 168 Vt. 48, 56 (1998). While deception does not require intent (*Poulin v. Ford*, 146 Vt. 120 (1986)), plaintiff must show that the omission was one that was likely to influence his conduct (*Peabody v. P.J.'s Auto Village, Inc.*, 153 Vt. 55 (1989)), and had the capacity or tendency to deceive (*Carter*, 168 Vt. at 56). A deceptive act is a material misrepresentation or omission that is likely to mislead a reasonable consumer. *Repucci v. Lake Champlain Campground, Inc.*, 251 F.Supp.2d 1235 (2002).

If anyone advising Countrywide is under the mistaken belief that "privity," or "direct involvement," is required in Vermont. Please be advised that the Supreme Court reasoned in the case of *Elkins v. Microsoft*, 817 A.2d 9, 12, (2002), that pursuant to 9 V.S.A. § 2461(b), the act permits "any *consumer* who sustains damages or injury as a result of false or fraudulent representations to sue and recover from the seller, solicitor or *other violator* . . . ." (emphasis in original)

I understand that Sarah Martin is presently representing to a number of Countrywide personnel that she never said Countrywide would beat the 5.0%, no point rate. Dr. Bazilwich, and her father, Louis M. Georgiades (a retired Exxon-Mobil senior chemical engineer/project manager), are two extremely credible witnesses that will strongly dispute that untruth and swear under oath that she is lying. The credibility of Dr. Bazilwich and Mr. Georgiades; the likely motive for Ms. Martin to lie; and the complete lack of any alternate explanation for a responsible person such as Dr. Bazilwich to not have signed the Homebound papers unless the facts were are she has represented them, make me certain that the only uncertainty with a trial would be the award of damages, and not liability.

The worst case scenario for Countrywide is much more costly than buying a .5 point. And given what Dr. Bazilwich has been put through, Countrywide should buy at least a .75 point to bring the rate down to the 4.75% that Dr. Bazilwich was promised by Ms. Martin.

Neither of us should have had to get involved in this matter. Please attempt to make Ms. Luciano, or one of her supervisors, see the big picture.

I appreciate your consideration, and would be happy to discuss this matter with you at

Sandor E. Samuels, Esq., Chief Legal Officer
March 25, 2004
Page 3 of 3


your earliest convenience.  I can be reached at work most weekdays between 9 a.m. and 4:30 p.m. (EST) at (802) 863-0307, ext. 18.  Or at home at (802) 372-6145 most evenings after 6:15 p.m.


Cordially,


John J. Balkunas, Jr., Esq.

Enclosure
cc:    Dr. Anne K. G. Bazilwich (all without enclosure)
       Louis M. Georgiades
       Angelo R. Mozilo, Chairman, President, and CEO of Countrywide Financial Corp.



**HOME LOANS**

OFFICE OF THE PRESIDENT
6400 LEGACY DRIVE, MS PTX-56
PLANO, TEXAS 75024-3609

April 13, 2004

Mr. John J. Balkunas, Jr., Esq.
Dr. Anne K. G. Bazilwich
3 Old Town Lane
Grand Isle, VT 05458

RE: Countrywide Loan Inquiry

Dear Mr. Balkunas and Dr. Bazilwich:

Your correspondence to Mr. Sandor Samuels, Chief Legal Office of Countrywide Home
Loans ("Countrywide") regarding Dr. Bazilwich's complaint, was referred to me for
research and reply. We appreciate your patience while we reviewed your concerns.

We regret that Dr. Bazilwich was inconvenienced by the events you describe in your
letter. However, it is Countrywide's understanding that it was Dr. Bazilwich's father,
Louis Georgiades that called our Kingwood, Texas branch and spoke to Ms. Sarah Martin
to obtain a quote on the refinance for Dr. Bazilwich. Ms. Martin states that the only time
that she spoke with Dr. Bazilwich was on a conference call and that Mr. Georgiades was
a party to that call as well. Ms. Martin disputes your client's version of these
conversations.

Ms. Martin obtained information from Dr. Bazilwich and called one of our branches in
Virginia to see if they might be able to quote rates on a property located in Vermont since
our office in Texas cannot close loans in Vermont. The Virginia office advised Ms.
Martin that it would take 3 discount points to get a rate lower than 5%. Mr. Georgiades
was advised of these terms and that the loan would be processed out of a different office
than our Kingwood, Texas office. Mr. Georiades brought the Good Faith Estimate that
Homebound issued into our Kingwood Texas office and was informed by Ms. Martin that
we could not match the rate that Homebound was offering. Since Mr. Georgiades stated
he was acting as Dr. Bazilwich's agent at that time, Ms. Martin assumed that Mr.
Georgiades would convey to Dr. Bazilwich that Countrywide Home Loans could not
match the Homebound rate.

Exhibit "D"

Dr. Bazilwich
Page 2
April 13, 2004

On March 25, 2004 Lorene Butler of our Saratoga Springs, New York office, called Dr. Bazilwich and offered a loan at 5.50 % with no points. However, we could not match a rate in March of 2004 that was offered by Homebound in June of 2003.

We are sorry that Dr. Basilwich's experience with Countrywide did not meet her expectations; but based upon the foregoing, we do not feel that we owe any further obligation to honor Dr. Basilwich's demands.

Sincerely,

*Marti Luciano*

Marti Luciano
Customer Relations Specialist
Consumer Markets Division
Office of the President
800-669-6020 extension 6962

print | contact us |



**Countrywide Financial**    about us  |  investor relations  |  business partners  |

## What we're all about
## is all about you.

At CFC, we're helping you get the most out of our diversified financial services through our family of companies.

**about us**

- chairman's message
- Countrywide's history
- family of companies
- executive profiles
- news
- awards & recognition
- corporate responsibility
- corporate governance
- annual reports
- disclaimer
- FAQs

**investor relations**

**press room**

**careers**

click on each for details

## corporate responsibility

[corporate responsibility] | Code of Business Ethics | lending practices | philanthropy | diversity

focus on
corporate responsibility

Countrywide Financial takes its corporate and ethical responsibilities very seriously. We continuously seek to provide value to our customers, investors and workforce. Our reputation for integrity and responsibility is illustrated by our commitment to diversity, ethics, lending and philanthropy.

The A
Dream
Home
Chairma
announc
commitm
2003

Video hi
Window

Housi



Count
Histor



"In 1966
of amb
New Y

2002 A



Execu
Angelo
Stanfor

Countrywide home page | home loans | home loans en español | Full Spectrum Lending | we house america | banking | insurance | investment
your accounts | contact us | site map | about us | investor relations | press room | careers | privacy & security | licenses & registrations

Countrywide Home Loans, Inc. and Countrywide Bank, a division of Treasury Bank, N.A., are Equal Housing Lenders. © 2003 Countrywide Finar
Trade/service marks are the property of Countrywide Financial Corporation and/or its subsidiaries. All rights reserved.

Exhibit "E"

Countrywide's Code of Business Ethics

A Message from the CEO

Countrywide's Code of Business Ethics reflects the company's existing culture and serves as a guide for our directors, officers and employees in their daily activities. In all of our business practices, we are committed to doing the right thing. As a result, Countrywide has a strong reputation for integrity with its customers, business partners, shareholders and its own employees.

A culture of "corporate" ethics can only be built on a strong foundation of "personal" ethics. For this reason, we expect all of our directors, officers and employees to conduct themselves in a manner that reflects Countrywide's commitment to acting ethically and in compliance with the law. Every director, officer and employee is held accountable for complying with this Code.

The very nature of our business dictates a high level of respect for the confidentiality and privacy of customer and business partner information. We are also dedicated to ensuring the accuracy of our financial reporting and all other documentation that we prepare. We have strict policies prohibiting activities that conflict with the interests of Countrywide, our shareholders and our ability to provide unsurpassed service to our customers.

As Countrywide takes its place among the foremost diversified financial services providers, we will continue to set the industry standard for excellence and integrity.

Sincerely,
Angelo R. Mozilo
Chairman, CEO and President
Countrywide Financial Corporation


Overview

At Countrywide, ethical conduct and legal compliance are the foundation for our position of industry leadership. Countrywide's ability to maintain its leadership position requires that each employee, officer and director exhibit a high level of personal integrity when interacting with Countrywide customers, business partners, shareholders, and each other. Directors, officers and employees must allow honesty, common sense and good judgment to govern their conduct.

As a condition of employment, each officer and employee is expected to comply with this Code of Business Ethics and will be held accountable if he or she fails to do so. Any violation of this Code, or any conduct that violates any law, rule, regulation, or ethical or professional norm, is subject to disciplinary action, up to and including termination of employment. Directors, officers and employees are also expected to cooperate fully with any company audits or investigations and to answer all questions fully and truthfully. It is a violation of company policy to intimidate or impose any other form of retaliation on any employee who, in good faith, reports any actual or suspected legal, ethical, or policy violation.

This Code provides the standards of conduct that guide all directors, officers and employees of Countrywide. All of our directors, officers and employees must conduct themselves appropriately and seek to avoid even the appearance of improper behavior.

Our Ethics Statement serves as the benchmark by which each of our daily business decisions should be measured and lies at the very core of the Countrywide way of doing business:


"At Countrywide, ethical standards guide our business conduct. We act lawfully and with integrity in our dealings with our customers, business partners, shareholders, and with each other."
Compliance with Laws, Rules and Regulations

Countrywide directors, officers and employees are required to comply with all applicable laws, rules and regulations.

The Recording and Reporting of Countrywide Information

At Countrywide, we are committed to ensuring that all business-related information is recorded and reported accurately, honestly and in a timely manner. Directors, officers and employees must ensure that information is reported truthfully and correctly, and also exercise diligence in ensuring that reported information is organized in a way that is understandable and does not mislead or misinform those who receive the information. Our policy relating to accuracy of company records extends to financial statements, loan documents and servicing records prepared on behalf of our customers, and to information provided to government employees or officials.

Nowhere is Countrywide's commitment to ethical standards more evident than in how we communicate our financial position and operational results. We strive to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that we file with, or submit to, the Securities and Exchange Commission and in other public communications made by us. Countrywide officers and employees who prepare financial reports must exercise the highest diligence in ensuring that there are no false or misleading statements.

We also provide our officers and employees the means to confidentially and anonymously report concerns about accounting and auditing matters by calling 1-800-374-5580, which is operated 24 hours a day by operators employed by an independent helpline provider. The independent helpline provider may also be contacted by email at countrywidehelpline@edcor.com or by U.S. mail at P.O. Box 2133, Bloomfield Hills, MI 48303.

Insider Trading

The stock of Countrywide Financial Corporation is publicly held and traded on the New York Stock Exchange. In order to ensure that all investors have equal opportunity and fair advantage to make investment decisions, all Countrywide directors, officers and employees are subject to federal "insider trading" laws that prohibit them from buying or selling stock with advance knowledge of important company information that is unavailable to the general public. Such information may include proposed mergers or acquisitions, earnings predictions or changes in predicted earnings, new equity or debt offerings, unreleased production numbers and new product information. Countrywide directors, officers and employees are also prohibited from disclosing "inside information" to others who may use the information to trade company stock.

Countrywide's policies with respect to "insider trading" are also strictly enforced in reference to business partner information as to which Countrywide directors, officers and employees may have advance knowledge.

Unfair Business Practices

Countrywide's commitment to high ethical standards in its business practices with customers, business partners and competitors is reflected in our dedication to candid and forthright communications about our products and services. Unfair and deceptive business practices (e.g., the misuse of proprietary information or the misrepresentation of material facts) are strictly prohibited.

Anti-Trust and Anti-Competitive Activities

Countrywide offers its products and services to customers in compliance with antitrust laws, which prohibit Countrywide from entering into any agreement with its competitors to restrict the system of free trade by fixing prices, allocating territories or customers or refusing to provide service to particular customers. Countrywide's customers conduct business with the Company on the basis of its industry reputation. Our customers choose Countrywide as their financial services provider because of the quality

of its services and products.

Countrywide and its directors, officers and employees must, at all times, conduct business openly and avoid any situation that might even create the appearance that Countrywide has made any agreement that improperly impacts industry prices or the competition.

### Confidential and Proprietary Information

Because of the nature of our business, Countrywide possesses sensitive and confidential information about our customers, business partners and the Company itself. All directors, officers and employees have a duty to protect against the disclosure of such information unless disclosure is authorized and within the law.

With respect to our customers, who entrust us with confidential personal and financial information, Countrywide is committed to safeguarding all such information, including information gathered through applications and supporting documents, account information obtained in the course of our ongoing relationships with customers, and information exchanged through the Company's Web sites.

Similarly, Countrywide's directors, officers and employees may be exposed to proprietary or otherwise confidential information about a business partner. Countrywide directors, officers and employees accept responsibility for maintaining the confidentiality of confidential business partner information, neither using it for personal gain nor disclosing the information to others without proper authorization.

Finally, Countrywide directors, officers and employees may be privy to sensitive and confidential information about their fellow employees or Countrywide as a whole. Unauthorized disclosure of such information is strictly prohibited.

### Improper Influence

At Countrywide, all customers and business partners receive the same high level of assistance and service. Countrywide directors, officers and employees are strictly prohibited from giving, soliciting or accepting business courtesies or gifts intended to influence business decisions. All business decisions are to be made on the basis of the merit of the transaction and in compliance with any legal and regulatory requirements.

Countrywide also routinely conducts business with a variety of government agencies such as the Department of Housing and Urban Development, the Veteran's Administration and a host of state regulators, local and state bond authorities and others. What may be acceptable practice in the commercial business environment, such as providing nominal gifts and hospitality, may be inappropriate when managing relationships with government employees or those who act on the government's behalf. All directors, officers and employees must adhere to the relevant laws and regulations governing relationships with government customers, employees, and officials. Countrywide directors, officers and employees are strictly prohibited from improperly influencing the decisions of, or obtaining restricted information from, government employees or contractors by offering or promising to give money, gifts, loans, rewards, favors or anything else of value. Additionally, Countrywide exercises proper protocol in bidding on all government contracts, which prohibits the requesting of information from government officials or agents that would provide the Company with an unfair advantage.

### Discrimination in Hiring

Countrywide has a long-standing philosophy and operating policy of seeking qualified applicants for all positions in compliance with all federal, state and local laws governing equal employment opportunity. All hiring decisions must be made without regard to an individual's gender, race, color, religion, national origin, ancestry, pregnancy, age, marital status, sexual orientation, medical condition, veteran status, or physical or mental disability. Countrywide strives to be an employer of choice for a highly-diverse, best-in-class workforce.

### Harassment

Countrywide is committed to providing a work environment that is free of unlawful discrimination and harassment. We strive to create a work environment in which everyone is treated with respect and dignity. It is our philosophy that every employee has the right to work in an atmosphere that provides equal employment opportunities and prohibits discriminatory practices and conduct, such as illegal harassment, including sexual harassment. Countrywide takes illegal harassment seriously and will endeavor to prevent, investigate and correct harassment in the workplace or in any setting where company business or a company-sponsored event is being conducted.

Safety

Countrywide strives to ensure the health and safety of each of its employees, customers and visitors by maintaining a workplace that is free of unsafe and/or hazardous conditions. Countrywide has established a Safety Program, which includes procedures for correcting unsafe conditions and for responding in emergency situations. As part of our commitment to creating a safe work and operating environment, drug and alcohol abuse in the workplace is strictly prohibited.

Workplace Violence

Countrywide is committed to providing its employees with a safe and productive workplace. Countrywide's policy prohibits any acts or threats of violence by or against Countrywide's employees, customers, vendors or other visitors. Countrywide does not tolerate actual or threatened workplace violence against co-workers, customers, vendors, visitors, or any other persons who are either on Countrywide's premises or have contact with employees in the course of their duties.

Conflict of Interest and Corporate Opportunities

Just as we are committed to providing our employees with a secure and supportive work environment, we expect our directors, officers and employees to act in the best interest of Countrywide and its customers, business partners and shareholders at all times. Each director, officer and employee has a responsibility to ensure that his or her personal interests do not conflict with those of Countrywide. Using Countrywide property or information, or leveraging Countrywide business opportunities to achieve personal gain or to benefit a person or entity outside of Countrywide, is a direct violation of Countrywide's conflict of interest policy. In addition, should a director, officer or employee believe that a contemplated material transaction or relationship could reasonably be expected to give rise to a conflict of interest, he or she should notify one of the persons listed in the "Reporting Unethical or Illegal Conduct/Ethics Questions" section of this Code.

A director, officer or employee may not represent Countrywide in any transaction with a person or an entity, in which the director, officer or employee or his/her spouse, children, and other members of the director, officer or employee's household have a direct or indirect interest, or from which the director, officer or employee may derive an improper personal benefit. To avoid possible conflicts of interest, directors, officers and employees may not process or approve a loan application that was submitted on behalf of their spouse, relative, personal friend or member of their household. Any such loan application must be processed and approved by a loan officer or manager who is not supervised by the director, officer or employee.

Protection and Proper Use of Company Assets

All employees have an obligation to protect Countrywide's assets (e.g., computer equipment and software, intellectual property, etc.) and ensure that those assets are efficiently used. All of Countrywide's assets must only be used for legitimate business purposes.

Reporting Unethical and Illegal Conduct/ Ethics Questions

Countrywide requires its employees to report illegal or unethical conduct and to ask questions about the

appropriateness of conduct. In this regard, employees are required to report any legal, ethical, or policy violation to one of the following (in the event that the employee is reporting the conduct of one of the people listed below, the employee should make the report to another person on the list):

Their Employee Relations Representative
The Chief Compliance and Ethics Officer
The Managing Director for Human Resources
The Chief Administrative Officer
An attorney in the Countrywide Legal Department

Additionally, employees may report such violations to Countrywide's internal Ethics Helpline via telephone or e-mail, or use the Helpline to ask questions and discuss any concerns they may have about ethical conduct at Countrywide. The internal Ethics Helpline can be reached at (800) 877-4200 or, by email, at Ethics_Helpline@Countrywide.com. Employees may also confidentially and anonymously report ethics concerns, including concerns about accounting and auditing matters, to an independent, third party helpline provider through one of of the following methods:

By telephone, at 1-800-374-5580 (staffed 7 days a week, 24 hours a day by operators)
By email, at countrywidehelpline@edcor.com
By U.S. mail, at P.O. Box 2133, Bloomfield Hills, MI 48303.

With respect to any employee who makes a non-anonymous report and requests confidentiality, Countrywide will take reasonable steps to maintain confidentiality, so long as such confidentiality does not impede Countrywide's investigation or loss prevention efforts and disclosure is not otherwise required by law.
Similarly, to the extent that it does not impede an investigation or Countrywide's legal obligations, Countrywide will maintain the confidentiality of employees about or against whom allegations of violation have been brought, unless or until it has been determined that an actual violation has occurred.

IT IS A VIOLATION OF COMPANY POLICY TO INTIMIDATE OR IMPOSE ANY OTHER FORM OF RETALIATION ON ANY EMPLOYEE WHO, IN GOOD FAITH, LAWFULLY OR TRUTHFULLY REPORTS ANY ACTUAL OR SUSPECTED LEGAL, ETHICAL OR POLICY VIOLATION.